9 A.3d 596 (2010)
417 N.J. Super. 251
STATE of New Jersey, Plaintiff-Appellant,
v.
Richard LYONS, Defendant-Respondent.
Docket No. A-4893-09T2
Superior Court of New Jersey, Appellate Division.
Argued October 25, 2010.
Decided November 30, 2010.
*597 Frank J. Ducoat, Deputy Attorney General, argued the cause for appellant (Paula T. Dow, Attorney General, attorney; Mr. Ducoat, of counsel and on the brief).
Stephen P. Hunter, Assistant Deputy Public Defender, argued the cause for respondent (Yvonne Smith Segars, Public Defender, attorney; Mr. Hunter, of counsel and on the brief).
Before Judges LISA, REISNER and SABATINO.
The opinion of the court was delivered by
LISA, P.J.A.D.
Defendant was charged in a three-count indictment with possessing, offering and distributing child pornography by use of a peer-to-peer file sharing network on the Internet. The trial court granted defendant's motion to dismiss the counts charging offering and distributing, both second-degree crimes in violation of N.J.S.A. 2C:24-4b(5)(a).[1] The court was of the view that these counts were defective because the State presented no evidence to the grand jury that defendant intended to transfer or distribute the images contained in his shared folder, and, even though defendant knew they were accessible to others over the Internet by virtue of being in such a folder, defendant's passive conduct could not be sufficient to constitute distributing or offering the materials. We granted the State leave to appeal and now reverse.

I
What follows is a summary of the evidence presented to the grand jury. LimeWire is a software program that, when installed on a computer, creates a shared folder and allows the user to access other shared folders on the network. Peer-to-peer file sharing is a process by which users of programs such as LimeWire can receive and transmit data from and to each other over the Internet. They do so by accessing each other's shared folders. Users of the same network, here the Gnutella network, may therefore access and download files that other users have made available by placing them in their shared folder. Indeed, the purpose of the shared folder is to effectuate the exchange of files *598 from one user's computer to that of another user.
LimeWire's default setting is such that materials in a user's shared folder are accessible to others on the network. In this mode, when one user searches for and downloads materials from another user, the materials go into a shared folder and become available to all other users on the network. However, users have the ability to change the setting in a manner that precludes others from accessing their shared folder. A user could also prevent access to materials by removing them from the shared folder.
On May 30, 2007, Detective John Gorman of the New Jersey State Police Digital Technology Investigations Unit (DTIU) logged on to the Gnutella Network via LimeWire and entered search terms indicative of child pornography. He located a computer that had available in its shared folder a known child pornography video. He downloaded it to his computer. The video depicted a naked prepubescent girl, clearly under the age of sixteen, performing oral sex on an adult male. Gorman also downloaded other suggestively named files from the shared folder, which were later confirmed to be pictures and videos depicting child pornography. Subsequent forensic investigation established that the computer from which the video was obtained belonged to defendant.
Based on that information, a search warrant was issued for defendant's residence. The police executed the warrant on September 25, 2007. Defendant lived alone. He was present when the warrant was executed. He acknowledged that the two computers in the residence were his. An on-site forensic preview located child pornography on one of the computers. After the computers were seized, a detailed forensic examination located approximately twenty-five videos of children engaged in sexual activity, including the above-described file that Gorman downloaded on May 30, 2007. The file was identifiable by its secure hash algorithm (SHA) value, a numerical value that acts as a data file's digital DNA. These files were located in defendant's LimeWire shared folder. The examination also revealed that defendant's LimeWire program was set to permit sharing of files with other users.
While still in his home at the time of the search warrant execution, defendant gave the police a recorded statement after he was advised of and waived his Miranda[2] rights. DTIU Detective Charles Allen, the team leader of the search warrant execution, took the statement. Allen was the State's sole witness before the grand jury. In his testimony, he referenced and highlighted portions of defendant's statement, and the transcribed statement was marked as an exhibit and given to the grand jurors.
In his statement, defendant acknowledged having significant familiarity with computers and the Internet. He had received training in computers, and had built and worked with computers. Indeed he described the desktop computer in his residence as one that "I built myself." When asked whether he had any "file sharing clients" on that computer, defendant answered in the affirmative and said he had LimeWire on his computer. Defendant then admitted his awareness that files in his shared folder were accessible to others:
[Allen]: Can you just, just briefly in your own words tell me what [LimeWire] is and how it works?
[Defendant]: It's a file sharing program[.] [I]f I type in a keyword on the search program it will find it and I'll go *599 to other people's computers and pull the file to it.
[Allen]: Do you realize that when you download a file using Lime[W]ire it goes to a shared folder and that the shared folder is available for other[]s to obtain...
[Defendant]: Yes.
[Allen]: ... the information?
[Defendant]: Yes.
[Allen]: You know that?
[Defendant]: Yes.
In his answer to the next question, defendant acknowledged that he knew he had the ability to "set it not to share," but said he did not do so because he "just forgot."
Defendant also acknowledged that he obtained the child pornographic videos on his computer by conducting a "simple search" on LimeWire, using key words such as "kiddy," "Lolita," or "preteen." In response, "a bunch of them came up, [I] just clicked on a couple, and here I am." After watching the videos, defendant sometimes kept them. When he did, he kept them in his shared folder. Defendant answered affirmatively when asked whether he "kn[e]w  that possessing and viewing and distributing videos of children under the age of sixteen engaged in sex acts is a crime in ... New Jersey."

II
The two counts that are the subject of this appeal charge defendant with violation of this statutory provision:
Any person who knowingly receives for the purpose of selling or who knowingly sells, procures, manufactures, gives, provides, lends, trades, mails, delivers, transfers, publishes, distributes, circulates, disseminates, presents, exhibits, advertises, offers or agrees to offer, through any means, including the Internet, any photograph, film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act, is guilty of a crime of the second degree.
[N.J.S.A. 2C:24-4b(5)(a).]
The May 30, 2007 download by Gorman of the video we described is the subject of the first count, which charges defendant with distributing child pornography on that date. The second count pertains to the child pornographic materials found on defendant's computers, in his shared folder, when the search warrant was executed on September 25, 2007. It charges defendant with offering or agreeing to offer those materials between May 30, 2007 and September 25, 2007.
In support of his motion to dismiss those counts, defendant argued that he did not knowingly commit any of the acts proscribed by N.J.S.A. 2C:24-4b(5)(a) because he engaged in no overt actions in furtherance of the prohibited activity. Defense counsel described the ease of installation of a program such as LimeWire, accomplished by clicking on each next step as directed by the installation wizard. He then commented "that you can set up this program in about five minutes, and unless you're going to take the extra step or take it upon yourself to purposely change default settings, can we say that you're knowingly distributing, because you're using the program as it's designed by default."[3]
*600 On appeal, defendant advances the same argument, with some refinements. He argues that the failure to change the default settings was a mere omission, by which he did not prevent others from accessing or downloading child pornography on his computer. He further argues that the conduct criminalized by N.J.S.A. 2C:24-4b(5)(a) is defined by a list of active verbs, as a result of which his passive conduct cannot provide the basis for criminal liability. The trial court agreed. We do not.

III
The New Jersey Constitution guarantees the right to indictment by a grand jury. N.J. Const. art. I, § 8. The State must present the grand jury with sufficient evidence to support each charge presented. State v. Morrison, 188 N.J. 2, 12, 902 A.2d 860 (2006). A lack of evidence "would render the indictment `palpably defective' and subject to dismissal." Ibid. (quoting State v. Hogan, 144 N.J. 216, 228-29, 676 A.2d 533 (1996)).
Indictments should not be disturbed unless the State failed to present "some evidence" of each element of the crime so as to make out a prima facie case. Ibid. A judge's discretion to dismiss an indictment "should not be exercised except on `the clearest and plainest ground' and an indictment should stand `unless it is palpably defective.'" State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 18-19, 472 A.2d 1050 (1984) (quoting State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952)). When presented with a motion to dismiss an indictment, a trial court must determine whether, "viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." Morrison, supra, 188 N.J. at 13, 902 A.2d 860.
Generally, a decision to dismiss an indictment is left to the sound discretion of the trial court, and will only be overturned upon a showing of a mistaken exercise of that discretion. State v. Warmbrun, 277 N.J.Super. 51, 59, 648 A.2d 1153 (App.Div.1994), certif. denied, 140 N.J. 277, 658 A.2d 300 (1995). However, if a trial court's discretionary decision is based upon a misconception of the law, a reviewing court owes that decision no particular deference. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). Rather, we must ensure that there is no manifest denial of justice, and decide the controversy in the proper light of the applicable law. State v. Steele, 92 N.J.Super. 498, 507, 224 A.2d 132 (App.Div.1966).
To survive defendant's motion for dismissal the State must have presented to the grand jury "some evidence," Morrison, supra, 188 N.J. at 12, 902 A.2d 860, of each of the following elements: (1) defendant committed at least one of the statutorily prohibited actions with material depicting a child under the age of sixteen, (2) defendant did so knowingly, (3) the child depicted was engaged in a prohibited sexual act, or a simulation of such an act, and (4) defendant knew that the child depicted was engaging in prohibited sexual activity. Model Jury Charge (Criminal), "Endangering The Welfare of a Child (Pornography)" (2007).
Defendant does not dispute that the subject materials depict children under the age of sixteen engaging in prohibited sexual acts, and that he knew it. Therefore, the third and fourth elements are not in dispute, nor is the component of the first element that defines the nature of the material as depicting a child under the age of sixteen. The question before us is whether the State presented some evidence *601 to the grand jury that defendant knowingly committed at least one of the statutorily prohibited actions with the material on his computer as charged in each count. This issue has not been addressed in a published opinion in New Jersey. As we will discuss, it has been considered in other jurisdictions.
Although the question presented appears to require factual analysis, that is not the case. We have already laid out the relevant facts, as presented to the grand jury, of what defendant did and what he knew. The issue, then, is whether that conduct falls within the language of the statute as a matter of law. We must therefore construe the language of the statute.
The fundamental goal of statutory construction is to ascertain the Legislature's intent. State v. Reiner, 180 N.J. 307, 311, 850 A.2d 1252 (2004). Courts should ascribe to a statute a meaning that will "`effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" State v. Hoffman, 149 N.J. 564, 578, 695 A.2d 236 (1997) (quoting Merin v. Maglaki, 126 N.J. 430, 435, 599 A.2d 1256 (1992)). Examination of the statute's language is the starting point. State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982). "If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." Ibid.
The statutory terms signifying the prohibited conduct in this case are not defined in the Criminal Code. We must therefore ascribe to those words their ordinary meaning in common usage and read them in context with related provisions to give sense to the legislation as a whole. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005).
The actions prohibited by the relevant operative words in N.J.S.A. 2C:24-4b(5)(a) carry with them a plain meaning. The first count charges that defendant violated the statute by knowingly providing the video to a DTIU detective. "Provide" means "to furnish." Webster's II: New College Dictionary 891 (1999). Without the need to resort to dictionary definitions, several other terms in the statute would also apply to the first count, such as "deliver," "transfer," "distribute," or "disseminate." All are commonly understood, in the context of this statute, to mean the act by which one person gives an item to another. Count two charges that defendant "offered or agreed to offer" child pornography. Definitions of "offer" include "to present for acceptance or rejection" and "to make available." Webster's, supra, at 759. In the context of this statute, these terms commonly mean the act by which one person makes known to another that he or she may have for the taking an item possessed by the offeror.
To analyze defendant's argument that passive conduct or an omission to act cannot satisfy the active meaning of the words in the statute, we consider the ordinary meaning of the words in context with related provisions to further illuminate their meaning as part of the legislative scheme. As part of this process, we also trace relevant aspects of the legislative history.
As originally drafted, New Jersey's child pornography laws criminalized only the actual sale of the prohibited material. State v. Evers, 175 N.J. 355, 400, 815 A.2d 432 (2003). In an effort to "`expand the scope of the child pornography statute,'" the Legislature amended it in 1984 to include the long list of actions prohibited beyond selling. Ibid. (quoting Senate Judiciary Comm. Statement to S. 1843 (Dec. 8, 1983)); "The purpose of this bill [was] to fortify the child pornography law." Ibid. *602 (quoting Sponsor Statement to S. 1843 (Oct. 25, 1982)). It is thus clear that the Legislature sought to punish not only sellers, but anyone who in an almost unlimited number of ways transferred or even offered or agreed to offer the prohibited materials to others.
In 1992, the Legislature took another step by amending N.J.S.A. 2C:24-4 to make the knowing possession or viewing of child pornography a crime. L. 1992, c. 2, § 1. The purpose of the amendment was "to stop trafficking in child pornography." Assembly Judiciary Law and Public Safety Comm. Statement to A.263 (Jan. 30, 1992). "The rationale underlying the provision is to break the cycle of child pornography by attempting to destroy the market for this material which exploits children." Ibid. This amendment came on the heels of the United States Supreme Court's decision in Osborne v. Ohio, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), which "held that constitutionally protected privacy rights are not infringed on by statutes which allow the prosecution of persons who own or view such materials in their own homes." Ibid. The express reference to this timing by the legislative committee signifies a purpose to push to the constitutional limit our state's fight against the spread of child pornography.
To keep pace with the ever increasing use of electronic media, the Legislature in 1995 further expanded the sweep of N.J.S.A. 24-4b(5)(a) by adding as prohibited materials "computer program[s] [and] video game[s]" containing child pornography. L. 1995, c. 109, § 1. This amendment made the same change in N.J.S.A. 2C:24-4b(5)(b), dealing with possession and viewing child pornography. Ibid. The purpose of the bill was to "clarify" that such computer programs and video games were prohibited under the statute. Sponsor Statement to A.38 (June 9, 1994); Senate Judiciary Comm. Statement to A.38 (Nov. 3, 1994).
Most significant is a 1998 amendment, which added phrases such as "including on the Internet" to various sections of the child pornography laws. L. 1998, c. 126, § 1. In particular, it made two changes to the section involved in this case, N.J.S.A. 2C:24-4b(5)(a). It specified that the acts described in the statute are prohibited when performed "through any means, including the Internet." Ibid. It also added computer "files," along with the previously listed "computer programs," to the list of prohibited materials containing child pornography. Ibid. The purpose of the amendment was to "clarif[y] that the depiction and dissemination of child pornography on the Internet constitutes a crime under N.J.S.[A.] 2C:24-4" and to "broaden the scope of the statute and address the dramatic changes which have occurred in technology and communications networks." Senate Law and Public Safety Comm. Statement to A.1332 (Sept. 17, 1998). This amendment evinces a clear legislative intent to prohibit "any means" of dissemination of child pornography, specifically including over the Internet and specifically including computer "files" containing such materials. The amendment embodies into law the Legislature's ongoing efforts to stamp out the trafficking of child pornography, however effectuated, including through more advanced media and communications networks over the Internet.
Consideration of the terms in the statute in light of these legislative initiatives impels us to conclude that the terms should be construed very broadly. The evidence of what defendant did, while knowing what he knew, is the kind of conduct targeted by these enactments. Defendant used the modern technology of computers and the Internet, with a file sharing network, to *603 provide and offer child pornography he possessed in his shared folder.
The Criminal Code defines the requisite mental state for this offense, "knowingly," as follows:
A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.
[N.J.S.A. 2C:2-2b(2).]
Defendant acted with complete awareness of the relevant attendant circumstances, namely that his LimeWire shared folder materials were available to all other users of the network. He also acted with awareness of the practical certainty that his conduct would result in another user viewing and downloading the materials.
Therefore, with respect to count two, because defendant placed the materials in his shared folder with knowledge that he thus made them available to all other network users, the State presented some evidence that defendant knowingly offered the materials to others. With respect to count one, the State presented some evidence that defendant provided the materials to another because he placed the materials in his shared folder knowing that, by doing so, he made them available to other network users. Further, defendant knew and understood the purpose for which the network was designed and used. Gorman searched for and downloaded defendant's files in a manner consistent with defendant's understanding of the network's use.
We reject defendant's omission and passive conduct argument. He did act affirmatively. The evidence presented to the grand jury reflected that he installed the LimeWire program on his computer; he searched for and downloaded the files; he placed those files in his shared folder; he left them there knowing he was making them available to others and that others would, as he had, surely find them, view them, and download them onto their computers.
In the conventional world (as opposed to cyberspace) an individual might stand on a street corner long enough for millions[4] of people to pass by, holding child pornographic photos in his hand in full view and repeatedly announcing that he will give them to any takers. Surely that individual would be offering the materials to all who pass by and would be providing them to anyone who accepted the offer.
This scenario could be attenuated as follows: The individual places the child pornographic materials on a display stand on the corner, with a sign stating what they are and that any passerby may take some. Although the individual is not physically present, by his actions he is offering the materials to all who pass by and he is providing them to any takers.
That the individual is not physically present to "affirmatively" offer the materials to those passing by or to seek a taker and "affirmatively" hand him or her an item does not change the core nature of the individual's knowing conduct. While the evidential force under the second scenario might be weaker than under the first, a rational factfinder could find "offering" *604 and "providing" under either. What defendant did on his computer is the cyberspace functional equivalent of these scenarios. Like the individual in the second scenario, defendant, by his affirmative acts, set up the computer equipment to automatically offer the materials to others and provide them to anyone who accepted the offer. The many users of the network are the equivalent of the many people passing by the corner.
Defendant relies on provisions in the Criminal Code dealing with general principles of criminal liability in support of his passive conduct and omission argument. He argues that "[a] person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act," N.J.S.A. 2C:2-1a, but that criminal liability premised on an omission requires that the omission "is expressly made sufficient by the law defining the offense," N.J.S.A. 2C:2-1b(1), or "[a] duty to perform the omitted act is otherwise imposed by law." N.J.S.A. 2C:2-1b(2). See, e.g., State v. Hinds, 143 N.J. 540, 545-47, 674 A.2d 161 (1996) (holding that because N.J.S.A. 2C:30-2b defines official misconduct as a knowing failure to perform a duty imposed by law or clearly inherent in the nature of his office, a police officer could be criminally liable for failing to arrest another for a crime committed in his presence); cf. State v. Lisa, 194 N.J. 409, 411, 945 A.2d 690 (2008) (holding that "the Restatement of Torts did not provide sufficient notice of a duty to which a theory of criminal omission liability may attach"). Defendant argues that he cannot be criminally liable because N.J.S.A. 2C:24-4b(5)(a) does not expressly impose upon him a duty to prevent others from accessing his computer files and no such duty is otherwise imposed by law. Therefore, his failure to change his computer settings or remove the child pornographic materials from his shared folder cannot be the basis for criminal liability.
We reject this argument for two reasons. First, as we have explained, defendant's conduct did include voluntary acts. He did not merely come upon some child pornography by happenstance, in circumstances where it was plainly available to others, and then refrain from taking action to make it unavailable. Rather, defendant voluntarily took the active steps necessary to make the materials available to others. Second, N.J.S.A. 2C:2-1b prohibits criminal liability for an omission, unless it falls into one of the two exceptions, only if "based on an omission unaccompanied by action." Therefore, an omission not fitting one of the statutory exceptions does not shield an individual from criminal liability if that omission is part of a course of conduct that includes culpable voluntary acts. That is precisely what happened here.
Defendant continues to press the argument, which the trial court accepted, that he cannot be liable under N.J.S.A. 2C:24-4b(5)(a) because the State presented no evidence that he "intended" to sell, transfer or distribute child pornography. This argument lacks merit because defendant was not charged under the first phrase of the statute as a "person who knowingly receives for the purpose of selling" child pornography. N.J.S.A. 2C:24-4b(5)(a) (emphasis added). Therefore, a purpose or intent to sell or otherwise disseminate the prohibited materials was simply not an element of either count on which defendant was charged.
Our determination is bolstered by decisions of courts in other jurisdictions dealing with similar child pornography statutes and facts similar to those in this case. The manner in which other courts have analyzed these issues and the conclusions they have reached are similar to ours.
Federal courts have generally found that actions like those of defendant constitute *605 "distribution" under the analogous federal statute, 18 U.S.C.A. § 2252A(a)(2)(A) (criminalizing the "knowing[] recei[pt] or distribut[ion] [of] any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."). In United States v. Shaffer, 472 F.3d 1219 (10th Cir.2007), addressing conduct nearly identical to defendant's, the court had "little difficulty in concluding that [the defendant] distributed child pornography in the sense of having `delivered,' `transferred,' `dispersed,' or `dispensed' it to others." Id. at 1223.
While the court acknowledged that the defendant did not actively place the material into another's hands, it compared his distribution with that by an owner of a self-serve gas station:
The owner may not be present at the station, and there may be no attendant present at all. And neither the owner nor his or her agents may ever pump gas. But the owner has a roadside sign letting all passersby know that, if they choose, they can stop and fill their cars for themselves, paying at the pump by credit card. Just because the operation is self-serve, or in [the defendant]'s parlance, passive, we do not doubt for a moment that the gas station owner is in the business of "distributing," "delivering," "transferring" or "dispersing" gasoline; the raison d'etre of owning a gas station is to do just that. So, too, a reasonable jury could find that [the defendant] welcomed people to his computer and was quite happy to let them take child pornography from it.
[Id. at 1223-24.]
This analogy has been followed in several cases with nearly identical fact patterns to this one, including a military case, United States v. Christy, 65 M.J. 657, 664 (A.Ct.Crim.App.2007), rev. denied, 66 M.J. 189 (C.C.A.F.2008), and United States v. Carani, 492 F.3d 867 (7th Cir.2007); see also United States v. Griffin, 482 F.3d 1008 (8th Cir.2007) (relying on Shaffer and a prior Eighth Circuit case, United States v. Sewell, 457 F.3d 841 (8th Cir.2006), to find that the use of peer-to-peer file sharing software to download child pornography and make it available to other users constitutes "distribution").
In United States v. Sewell, 513 F.3d 820 (8th Cir.), cert. denied, 553 U.S. 1066, 128 S.Ct. 2517, 171 L.Ed.2d 789 (2008), the defendant was indicted for publishing a notice that offered to distribute child pornography. Id. at 821-22 (quoting 18 U.S.C.A. § 2251(d)(1)(A)) (describing the statute as criminalizing "behavior that `knowingly makes ... or causes to be made ... any notice ... offering ... to... distribute[] or reproduce' child pornography across state lines"). The defendant had pled guilty to a count of distributing child pornography by using a peer-to-peer file-sharing program called Kazaa.[5]Id. at 821. The court relied on Shaffer for the proposition that the use of file-sharing software can support a charge of distribution of child pornography. Id. at 822. The discrete issue before the court was whether the separate count was legally sufficient to allege "that the notice contained an offer to distribute child pornography, which is an essential element of the offense." Ibid.
The court held that placing a child pornography file named to accurately describe it as such in a searchable, accessible shared folder constituted making an offer to distribute that file over the file-sharing network. Ibid. The court explained:

*606 Kazaa's purpose is to allow users to download each other's files, and the purpose of the descriptive fields is to alert interested users to the content of down-loadable files. A keyword search of descriptive fields in Kazaa does not download the file. The search simply creates a list of downloadable files that contain the keyword in the file's descriptive fields. This list then displays the full descriptive fields for each listed file. Based on the notice the searcher has now been given regarding what other users are offering, the searcher can then choose to download the child pornography to his computer. In the context of the Kazaa program, placing a file in a shared folder with descriptive text is clearly an offer to distribute the file. [Ibid. (emphasis added).]
The court went on to relate its finding to the Shaffer gas station analogy, by noting that the descriptive terms attached to the file are like a road-side sign pointing a motorist to the gas station. Ibid.
In Christy, supra, 65 M.J. 657, the court rejected an argument that a user of file-sharing software, in a manner consistent with defendant's use here, is not actively distributing, but only passively possessing his files. The court noted that the defendant did not merely possess the items. He downloaded, installed, and set-up the software. Id. at 663. He placed files in his shared-folder, and "more important, [he] told the military judge he knew he had been `distributing' child pornography because he stored those files in his `shared files' folder, which other LimeWire users could access and from which they could download." Ibid. By affirmatively "downloading LimeWire software and setting up a `shared files' folder, [the defendant] agreed to share all files in that folder, i.e., all his child pornography, with all other LimeWire users." Id. at 664. Accordingly the court held the "use of peer-to-peer file-sharing software, to download and then shareor otherwise disseminatechild pornography stored on his computer, constitutes `distribution' of child pornography." Id. at 665.
We are also aware of one state court that has weighed in on the subject. A Texas statute similar to New Jersey's has been found to include in its definition of "disseminate" "making digital files available to others through peer-to-peer file sharing software." Wenger v. State, 292 S.W.3d 191, 199 (Tex.App.2009). The court relied on the federal cases we have discussed. Id. at 198-99. The defendant also challenged the sufficiency of the evidence regarding the requisite mental state, namely that even if his conduct constituted dissemination, the State failed to prove that he did so knowingly or intentionally as required by the applicable statute. Id. at 199. Conflicting evidence was presented at trial as to whether the defendant knew it was possible to change the default setting in his Shareaza peer-to-peer file sharing program to block access by others. Id. at 199-200. In an argument similar to that made in the case before us, the defendant argued that he should not be held criminally responsible for a result caused "automatically" by the Shareaza default setting. Ibid. The Court of Appeals was satisfied that the "jury could reasonably infer from th[e] evidence that [the defendant] knew Shareaza was sharing his downloaded files and knew how to prevent Shareaza from sharing his downloaded files." Id. at 200. The court therefore concluded that "the evidence [was] legally and factually sufficient to show that [the defendant] intentionally or knowingly disseminated the indicted files despite his argument that Shareaza shared the files automatically and without his knowledge or intent." Ibid.
The order dismissing counts one and two of the indictment is reversed and the *607 matter is remanded for further proceedings.
NOTES
[1] Defendant did not move before the trial court to dismiss the fourth-degree possessory count in violation of N.J.S.A. 2C:24-4b(5)(b). That count remains pending and is not involved in this appeal.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Because defendant admitted in his statement his knowledge of the default setting and his ability to change it to prevent access by others to materials in his shared folder, we need not be concerned with instructions provided with the program, the terms of LimeWire's license agreement, or the like.
[4] See LimeWire 5.5.14 Download Specifications, http://download.cnet.com/limewire (last visited Nov. 16, 2010) (noting that, to date, LimeWire software has been downloaded 206,954,294 times).
[5] Kazaa is a file sharing program identical in function to LimeWire. See Christy, supra, 65 M.J. at 664 (relying on Shaffer, where the defendant used Kazaa, to address the claim of a defendant who used LimeWire).